**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | Criminal. No.:  2:20-0121-RMG |
| | ) | |
| v. | ) | |
| | ) | |
| Alouis Levorge Taylor, | ) | **ORDER AND OPINION** |
| | ) | |
| Defendant. | ) | |
| | ) | |

Before the Court is Defendant's motion to suppress from evidence cocaine, marijuana, and a firearm recovered by the police. (Dkt. No. 65).  The Court held a suppression hearing on November 2, 2021.  For the reasons stated below, Defendant's motion is denied.

**I.     Background**

The Court conducted an evidentiary hearing on November 2, 2021 in which Charleston Police Officers Bruce and Frederick and former Charleston Police Officer (now FBI Agent) Bianchi testified.  The Court found highly credible the testimony of each officer and further found the Officers' testimony was corroborated by bodycam footage and other evidence. Accordingly, the Court credits their testimony and draws much of the facts set forth below from their testimony as well as the bodycam footage submitted to the Court.

On March 1, 2018, around 8:20 PM, Charleston Police Officers Bianchi, Bruce, and Frederick (collectively the "Officers") were on a routine patrol at an apartment complex called Bridgeview Village Apartments (the "complex") located on North Romney Street in Charleston, South Carolina.  Both the management of the complex as well as various residents had asked the Charleston Police Department to patrol the complex because of problems with nonresidents who were, *inter alia*, selling drugs and committing violent crimes at the complex.  The Officers were members of the Quick Response Squad ("QRS").  QRS was originally created as a critical

intervention unit in response to a 2016 incident in Dallas, Texas where five police officers were ambushed and killed. QRS's functions evolved, however, and as of 2018 it also engaged in proactive community policing throughout the Charleston area. Consistent with its history and mission, QRS units typically consisted of multiple officers.

On the night in question, the Officers rode in an unmarked Chevy Tahoe. The Tahoe was equipped with a bar of police lights but no spotlight. At the time the Officers entered the complex, Officer Bruce drove, Officer Bianchi sat in the front passenger seat, and Officer Frederick rode in the rear. All Officers were in uniform, carrying their service arms, and equipped with bodycams.

Upon entering one of the complex's parking lots, the Officers observed a Toyota Camry which was properly parked, but which had its headlights switched off and its engine running. The Officers observed an individual inside the car but could not ascertain either the race or gender of the individual. The Officers would later discover, and Defendant does not dispute, that he was the individual in the Camry. The Officers did not observe other parked but occupied cars that evening.

Office Bruce drove past Defendant, passing the Camry on the Tahoe's left. Because Defendant's vehicle was parked in a space which was perpendicular to a sidewalk, to leave his parking space Defendant would need to back his car up and then maneuver either left or right. Office Bruce stopped the Tahoe parallel to and about one or two spots past Defendant's Camry. *See* Gov. Ex. 2, (Officer Frederick Bodycam Footage) (0:00:14) (showing Officer Frederick exit the Tahoe and walk back toward Defendant's Camry). Office Bruce blinked the Tahoe's rear blue police light for one second. *See* Gov. Ex.  3, (Officer Bianchi Bodycam Footage) (0:00:16-17) (showing rear blue police light reflect off Officer Frederick's back). The Officers activated their blue light to identify themselves as police officers to Defendant and to avoid surprising Defendant as they approached his car. Officer Bruce did not activate the Tahoe's siren. After Officers

- 2 -

Bianchi and Frederick exited the Tahoe, Officer Bruce pulled the Tahoe forward roughly five spaces. *See* Gov. Ex. 1, (Officer Bruce Bodycam Footage) (0:00:04) (parking and exiting Tahoe and looking back toward Defendant's Camry). It was standard procedure for two officers to approach a single individual—the second officer providing cover to the first who would initiate the consensual interaction with the citizen.

As confirmed by bodycam footage, Officers Frederick and Bianchi approached Defendant's Camry at a casual, even slow pace. Officer Frederick walked towards the driver's door of the Camry while Officer Bianchi walked towards the front passenger door. As he approached the Camry, Officer Frederick switched on a flashlight but did not draw his weapon. When Officer Frederick arrived at the rear of the Camry, Defendant—without any prompting from either Officer Bianchi or Frederick—opened the driver's door of his vehicle. At this moment, Officer Frederick smelt what he believed was marijuana emanating from the car. The following conversation transpired:

> **Officer Frederick**: Hi, there. How are you? Hey, sir. How are you? I'm Officer Frederick with the Charleston Police Department. We're just getting out with you because we see you sitting over here. We've been having a lot of problems with loitering in the parking lot. Do you stay over here?
>
> **Defendant:** Uh uh.
>
> **Officer Frederick:** You visiting somebody?
>
> **Defendant**: Yeah, my aunt.

Officer Frederick Bodycam Footage, (0:00:18-30). While speaking with Defendant, Officer Frederick stood between Defendant and the driver's door of the Camry and kept his flashlight pointing down and away from Defendant's face.

- 3 -

During this conversation, Officer Bianchi, who had walked up to the front passenger door, began to look inside the Camry with his flashlight. In a cup holder in the center console, next to a large drink, Officer Bianchi saw a plastic bag filled white powder—a substance Officer Bianchi believed was cocaine.  Officer Bianchi also saw, on the floor of the front passenger side of the Camry, a black garbage bag. Officer Bianchi Bodycam Footage, (0:00:32) (view into Camry through front passenger window showing center console, a plastic bag with a white substance inside, and an object on the front passenger floor).

Upon viewing these items, Officer Bianchi told Officer Frederick to "pull [Defendant] out" of the car. *Id.* (0:00:33-34).  Officer Frederick instructed Defendant to "Get out of the car" and "Keep [his] hands where [Officer Frederick] c[ould] see them." Defendant, however, did not comply.  Instead, Defendant fled—quickly reversing out of his spot, darting forward, colliding with a parked vehicle, and speeding away from the Officers. Officer Frederick Bodycam Footage, (0:00:30-40).

At this point, all three officers got into the Tahoe and pursed Defendant. In another part of the complex, the Officers found Defendant's Camry abandoned in the middle of a roadway connecting two parking lots. The front right wheel of the vehicle was almost horizontal to the ground.  When the Officers found the Camry, the driver's door was open. Officer Frederick Bodycam Footage, (0:01:54). While other officers searched for Defendant, Officer Frederick remained with the Camry.

With the assistance of K9s, in the breezeway of one of the apartment buildings, officers found a large vacuum sealed bag containing five smaller heat-sealed bags, each containing roughly one pound of marijuana. Officer Bruce Bodycam Footage, (0:02:00-09).  Upon finding the garbage bag, an officer audibly comments that he "can smell it"—"it" being marijuana. Officer Bianchi

identified this garbage bag as the same one he first observed in the Defendant's Camry.  Upon returning to the Camry, Officer Bianchi found, in the same spot he had initially seen it, the bag of white powder originally observed through the Camry's passenger side window. The Officers performed a field test on the substance in the bag.  The substance tested presumptive for cocaine.

While inspecting the interior of the open Camry, Officer Bruce noticed a loose panel on the right side of the center console, around the point where the carpet of the vehicle meets the console.  Upon removing the panel, under the Toyota's gearshift, in a natural void, Office Bruce found a firearm.

On February 12, 2020, the Government charged Defendant in a three-count indictment with (1) possession with intent to distribute cocaine and marijuana, in violation of 21 U.S.C. 841(a)(1), 841(B)(1)(C), and 841(b)(1)(D); (2) possession of a firearm, in violation of 18 U.S.C. 924(c)(1)(A)(i); and (3) felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), 924(a)(2), and 924(e).  Defendant now moves to suppress from evidence the cocaine, marijuana, and firearm found by the police. (Dkt. Nos. 65, 82).  The Government responded in opposition (Dkt. No. 72) and the Court conducted a suppression hearing on November 2, 2021.  At the hearing, the Government offered evidence in the form of live testimony from Officers Bianchi, Bruce, and Frederick, as well the Officers' respective bodycam videos. Defendant offered into evidence a screenshot from Officer Bruce's bodycam footage, a June 5, 2018 Incident/Investigation Report drafted by Officer Bruce from an unrelated incident, the Charleston Police Department Field Guide, a January 15, 2019 Letter from Lieutenant Thomas Adams to Captain Searson discussing QRS, a March 1, 2018 Incident/Investigation Report drafted by Officer Frederick concerning the events described above, a June 28, 2018 Incident/Investigation Report drafted by Officer Frederick concerning an unrelated incident, and various images of the complex from Google Maps.

- 5 -

Defendant also offered evidence in the form of live testimony from Special Agent Barbosa of the Drug Enforcement Agency.

## II.    Legal Standard

When deciding a motion to suppress, the district court may make findings of fact and conclusions of law. *United States v. Stevenson,* 396 F.3d 538, 541 (4th Cir. 2005). During the hearing, "the credibility of the witness and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. McKneely,* 6 F.3d 1447, 1452–53 (10th Cir. 1993) (internal quotation marks omitted); *see also Columbus–Am. Discovery Grp. v. Atl. Mut. Ins. Co.,* 56 F.3d 556, 567 (4th Cir.1995) ("[I]n the usual case, the factfinder is in a better position to make judgments about the reliability of some forms of evidence than a reviewing body acting solely on the basis of a written record of that evidence. Evaluation of the credibility of a live witness is the most obvious example.") Once the defendant establishes a basis for his motion to suppress, the burden shifts to the Government to prove the admissibility of the challenged evidence by a preponderance of the evidence. *United States v. Matlock,* 415 U.S. 164, 177 n.14 (1974).

## III.    Discussion

### A.    The Officers' Initial Encounter with Defendant Was Not a Seizure.

Defendant argues that he was seized "immediately upon the officers' arrival." Citing *Terry v. Ohio*, Defendant continues that because the Officers lacked reasonable suspicion to seize him, all evidence subsequently obtained must be suppressed. For its part, the Government argues that the encounter between the Officers and Defendant was consensual and only became a seizure when Officer Frederick asked Defendant to step out of the car. The Government further argues that

because Defendant never complied with Officer Frederick's instructions, at best there was an attempted seizure.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable ... seizures." U.S. Const. amend. IV. This guarantee does not extend to all police-citizen encounters. Rather, as the Supreme Court has instructed, "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Police-citizen encounters that are consensual require no justification, but those that are not consensual impose a detention on a citizen and so must be supported by an officer's reasonable, articulable suspicion. *See Florida v. Bostick,* 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991); *Terry,* 392 U.S. at 21, 88 S. Ct. 1868.

As a general matter, law enforcement officers do not effectuate a detention or seizure "merely by approaching individuals on the street or in other public places and putting questions to them." *United States v. Drayton,* 536 U.S. 194, 200, 122 S. Ct. 2105, 153 L. Ed. 2d 242 (2002). But, an officer's authority to initiate an encounter with a citizen rather than detain him is "no greater than[ ] the authority of an ordinary citizen to approach another on the street and ask questions." *United States v. Burton,* 228 F.3d 524, 527 (4th Cir. 2000).

"[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Bostick,* 501 U.S. at 439, 111 S. Ct. 2382. In resolving this question, the Fourth Circuit follows the standard set forth in *United States v. Mendenhall,* 446 U.S. 544, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980) (plurality op.), asking

"whether 'in view of all [of] the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *United States v. Gray,* 883 F.2d 320, 322 (4th Cir. 1989) (quoting *Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870 (plurality op.)).

This "reasonable person" standard "is an objective one," thus "its proper application is a question of law." *Weaver,* 282 F.3d at 309 (quoting *United States v. Sullivan,* 138 F.3d 126, 133 (4th Cir.1998)). Where, as here, physical force is absent, a seizure requires both a "show of authority" from law enforcement officers and "submission to the assertion of authority" by the defendant. *California v. Hodari D.,* 499 U.S. 621, 626, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991) (emphasis omitted). In determining whether a police-citizen encounter constitutes a seizure, courts consider various factors (hereinafter the "*Black*" factors) including but not limited to:

> (i) the number of police officers present at the scene; (ii) whether the police officers were in uniform; (iii) whether the police officers displayed their weapons; (iv) whether they touched the defendant or made any attempt to physically block his departure or restrain his movement; (v) the use of language or tone of voice indicating that compliance with the officer's request might be compelled; (vi) whether the officers informed the defendant that they suspected him of illegal activity rather than treating the encounter as routine in nature; and (vii) whether, if the officer requested from the defendant ... some form of official identification, the officer promptly returned it.

*United States v. Watkins*, 816 F. App'x 821, 825 (4th Cir. 2020), *cert. denied sub nom. Knicely v. United States*, 141 S. Ct. 1282, 209 L. Ed. 2d 16 (2021) (citing *United States v. Black*, 707 F.3d 531, 537-38 (4th Cir. 2013)). "[W]ith respect to the fourth factor, [the Fourth Circuit has] held that when an officer has used his cruiser to physically block a suspect's vehicle from leaving, the suspect is seized." *Id.* (citing *United States v. Jones*, 678 F.3d 293, 300-01 (4th Cir. 2012)). In his briefing, Defendants focuses on three cases he believes support his position, principally arguing that the Officers' Tahoe blocked Defendant's Camry from leaving. The Court briefly summarizes those cases before analyzing the instant matter under the factors articulated in *Black*.

In *United States v. Jones*, 678 F.3d 293 (4th Cir. 2012), the Fourth Circuit found a seizure occurred where, after conspicuously trailing a defendant in their marked cruiser, police officers parked directly behind defendant on a one lane road, blocking his exit. *See id.* at 302-04 (also finding a seizure because, after exiting his car, officers quickly approached defendant, asked him to lift his shirt to see if defendant had a weapon and asked if they could pat defendant down).

In *United States v. Stover*, after observing a couple in a truck that was double parked in an apartment building parking lot around 1:00 a.m., police officers parked their marked cruiser three feet behind the defendant's truck, turned on their emergency lights and trained their spotlight on the driver's side of the truck. 808 F.3d 991, 993 (4th Cir. 2015). Considering *Jones*, the Fourth Circuit found a seizure had occurred. *See id.*

Finally, in *United States v. Black*, the Fourth Circuit held a seizure occurred and that defendant had passively acquiesced to a show of police authority where, after six officers surrounded the defendant and the men defendant was standing outside with, defendant voluntarily offered his ID to an officer and the officer pinned defendant's ID to his uniform. 707 F.3d 531, 536–38 (4th Cir. 2013).

Considering the totality of the circumstances here, the Court finds that Defendant was not seized upon the Officers' arrival. *See Bostick*, 501 U.S. at 434 ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual in the street or in another public place, by asking him if he is willing to answer questions, [or] by putting questions to him if the person is willing to listen . . . .") (internal quotation marks omitted); *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002) ("It is axiomatic that police may approach an individual on a public street and ask questions without implicating the Fourth Amendment's protections."). To the contrary, the Court finds the encounter was a consensual one permitted under binding case law.

Here, while three officers were present, armed, and in unform, only two officers approached Defendant's car and neither Officer Frederick nor Bianchi ever drew his service arm while interacting with Defendant.  Contrary to Defendant's assertions otherwise, Officer Bruce never blocked Defendant's car—the fact Defendant fled without coming close to striking the Officers' Tahoe prove this. Further, both Officers Bianchi and Frederick walked slowly—not rapidly as Defendant contends—toward Defendant's car before Defendant, without prompting, voluntarily opened his door to engage Officer Frederick.  Officer Frederick spoke calmly to Defendant, introducing himself, and explaining that there was a general problem with loitering at the complex and then asked if Defendant lived there or was visiting anyone.  These actions, which took place over the course of seconds, show little more than police officers approaching a citizen to engage in the type of consensual encounter the Fourth Circuit has already sanctioned. *See United States v. Lewis*, 606 F.3d 193, 197-98 (4th Cir. 2010) (rejecting defendant's argument that officers seized him as soon as they approached his car and finding officers were entitled to approach defendant "who was sitting in his parked car, late at night"); *United States v. Gray*, 883 F.2d 320, 322 (4th Cir. 1989) (finding no detention when officers who approached the defendant in an airport initially "informed [him] of the DEA's purpose and function, [and] treated the questioning as a matter of routine, rather than as a particularized investigation of [the defendant]"); *see also United States v. Radcliffe*, 757 F. App'x 250, 253 (4th Cir. 2018) (unpublished) ("Where, as here, two police officers with holstered sidearms merely approached Radcliffe on a public street, their presence would not be so intimidating that a reasonable person would have felt unable to leave."). The facts here stand in stark contrast to the cases, discussed above, on which Defendant principally relies.

In his motion, Defendant argues that his remaining in the Camry and opening the door to speak to Officer Frederick shows his "submission" to the Officers' show of authority. (Dkt. No.

65 at 7); *see Hodari D.,* 499 U.S. at 626 (noting that where, as here, physical force is absent, a seizure requires both a [1] "show of authority" from law enforcement officers and [2] "submission to the assertion of authority" by the defendant). The Court need not consider this argument because the Court finds that Defendant has not established that the Officers restrained Defendant's liberty through a "show of authority" by arriving at or approaching the Camry. Putting this fact aside, however, if the Court were to accept Defendant's argument on the facts of this case, a defendant could unilaterally turn a casual encounter with police into a "seizure" by preemptively rolling down a window, opening a door, or simply responding to a police officer once he saw an officer or multiple officers approaching.   This would run directly afoul of binding Fourth Circuit precedent, *see Lewis*, 606 F.3d at 197-98 (rejecting defendant's argument that officers seized him as soon as they approached his car and finding officers were entitled to approach defendant "who was sitting in his parked car, late at night"), and would effectively prohibit community policing. Equally hollow is Defendant's argument, presented at the suppression hearing, that Defendant was "seized" because Officer Frederick stood between Defendant and Defendant's car door while speaking to him.  Defendant, it seems, would have the Court find that when a police officer wishes to engage in a casual encounter with a citizen, unless a police officer stands six to twelve feet away from the driver of a car, that encounter constitutes a seizure under the Fourth Amendment.  The Court will not abide and rejects both of Defendant's arguments as unreasonable.

Defendant also argues that the activation of the Tahoe's emergency lights for one second "constitute[d] a seizure" *per se*. (Dkt. No. 65 at 6).  In support of this argument, Defendant cites *United States v. Duty*, 204 Fed. App'x 236, 237 (4th Cir. 2006) (unpublished). In *Duty*, the Fourth Circuit held a seizure occurred where, after spotting defendant's vehicle parked in a cul-de-sac

with its engine running, an officer activated her emergency lights and stopped ten to fifteen feet behind defendant's vehicle with her lights still flashing.

The Court rejects Defendant's contention that the Officers' use of their blue light consisted a seizure per se. The Court finds instructive the Sixth Circuit's decision in *United States v. Carr*, a closely analogous case.  In *United States v. Carr*, 674 F.3d 570 (6th Cir. 2012), police officers patrolling a high-crime area at night in an unmarked SUV stopped near a parked car without blocking the vehicle's egress. The officers "'momentarily activated the blue lights,' which were 'immediately turned off' in order 'to inform the passenger of the vehicle that [they] were police and not someone trying to do him harm,'" and two of the officers walked to either side of the parked car to speak with him. *Id.* at 572. Rejecting Carr's motion to suppress, the Sixth Circuit concluded that "the officers' use of blue lights was not sufficiently coercive to transform this encounter into a compulsory stop," reasoning that "[a]n encounter does not become compulsory merely because a person identifies himself as a police officer." *Id.* at 573 (holding it was "reasonable for the officers to identify themselves as police officers by flashing the vehicle's blue lights once."). Here, like in *Carr*, the Officers were riding in an unmarked car in a high crime area at night. Officers Bianchi and Frederick testified that the Officers flashed their blue lights for a single second to indicate to Defendant that the Officers were policemen.  Officer Bianchi testified the officers flashed their blue light for safety reasons—namely to avoid a situation in which Defendant believed robbers were exiting the Tahoe and where Defendant potentially pulled a gun on the Officers, provoking a lethal and unnecessary confrontation.  Given the testimony by all three officers that the complex had significant issues with violent crime and drug dealing, the Court finds the Officers' reasons for using the blue police light reasonable and highly credible.

Accordingly, the Court rejects Defendant's contention that the Officers' blinking the Tahoe's blue light for one second was per se a seizure under the Fourth Amendment.

In sum, the Court finds that Defendant's encounter with the Officers was consensual and rejects Defendant's contention that a seizure occurred "immediately upon the officers' arrival."

**B.    The Officers Had Probable Cause to Search Defendant's Camry for Drugs Upon Smelling Marijuana Emanating from the Vehicle.**

The Fourth Circuit has "repeatedly held that the odor of marijuana alone can provide probable cause to believe that marijuana is present in a particular place." *United States v. White*, 836 F.3d 437, 441 (4th Cir. 2016), *abrogated in part on other grounds by United States v. Stitt*, 139 S. Ct. 399, 202 L. Ed. 2d 364 (2018) (quoting *United States v. Humphries*, 372 F.3d 653, 658 (4th Cir. 2004)). Therefore, "when marijuana is believed to be present in an automobile based on the odor emanating therefrom, we have found probable cause to search the automobile." *Id.*; *see also, e.g.*, *United States v. Lewis*, 606 F.3d 193, 198 (4th Cir. 2010) (finding probable cause justifying a vehicle search when an officer "smelled the odor of marijuana emanating from the vehicle"); *United States v. Carter*, 300 F.3d 415, 422 (4th Cir. 2002)  (holding that an officer "clearly had probable cause to search the passenger compartment of [the] vehicle without a warrant, based on the burning marijuana he smelled as he approached the car").

Officer Frederick testified unequivocally that when Defendant opened the driver's door to the Camry, Officer Frederick immediately smelt marijuana.  Officer Frederick testified that he was familiar with the smell of marijuana based on his training and experience.  Officer Frederick testified that, in his training and experience, the smell of marijuana can linger on an individual or in a space if an individual manipulates marijuana.  Officer Frederick further testified that the smell of marijuana can linger in a space even after all marijuana in that space has been consumed.  When

the Government's attorney asked Officer Frederick to smell a heat-sealed bag containing a certain quantity of the marijuana recovered from the evening of March 1, 2018, and despite the marijuana itself being in at least another layer of packaging, Officer Frederick testified he could smell marijuana. One of Defendant's attorneys, while handling the same bag of evidence, admitted that he too could smell marijuana through the heat-sealed bags. Officer Bianchi testified that beside the marijuana found in the garbage bag located in a breezeway of the complex, no other marijuana was found in the Camry.

Officer Bianchi testified that when he approached Defendant's Camry, he saw a large black garbage bag on the floor of the Camry. Bodycam footage corroborates this. Officer Bianchi testified that the bag the Officers later located in a breezeway of the complex was the same bag as that which Officer Bianchi initially saw in Defendant's car. Officer Bruce's bodycam footage shows a K9 locate this bag and the same footage also shows an officer audibly stating, *sua sponte*, that he could smell marijuana.

Officer Bruce testified that upon looking inside the abandoned Camry he noticed a loose panel on the passenger side of the center console. Officer Bruce testified that in his experience loose panels are indicative of places where individuals commonly hide contraband. When the Officers pulled away the panel, the Officers found a firearm.

The Court finds the Officers had probable cause to search the interior of the Camry the moment Officer Frederick smelt marijuana emanating from Defendant's vehicle. Officer Frederick's testimony that he smelt marijuana emanating from Defendant's Camry was highly credible. *See, e.g., United States v. Scheetz*, 293 F.3d 175, 184 (4th Cir. 2002) ("[B]ecause marijuana has a distinct smell, the odor of marijuana alone can satisfy the probable cause requirement to search a vehicle or baggage." (quotation marks and citation omitted)); *United States*

*v. Pond*, 523 F.2d 210, 213 (2d Cir. 1975) ("It cannot be disputed that marijuana has a distinctive pungent odor."); *United States v. Stancle*, 184 F. Supp. 3d 1249, 1254 (N.D. Okla. 2016) (crediting officers testimony "that it is common to initially detect the odor of marijuana without later finding any marijuana because its strong odor can linger even after marijuana has been removed from a vehicle").  At the time the events in question occurred, each officer had considerable police experience.  When presented marijuana which the Government reliably established though oral testimony and video footage originated in Defendant's vehicle—marijuana which is now over three years old—Officer Frederick testified he could detect the odor of marijuana despite various layers of sealed plastic.  So could Defendant's own attorney.  The Officers found five pounds of marijuana in the garbage bag originally viewed in Defendant's Camry.  In sum, the Court finds Officer Frederick, standing roughly 6-10 feet from the front door of the Camry, indeed smelt marijuana emanating from Defendant's vehicle. *See United States v. Humphries*, 372 F.3d 653, 658 (4th Cir. 2004) ("From 20 feet away, the officers detected the distinct odor of marijuana, and they continued to smell the marijuana as they approached [defendant] and another man standing nearby.").  Accordingly, from that moment on, the Officers had probable cause to search, at the very least, the entire interior of Defendant's vehicle for drugs and the Officers' subsequent warrantless search of the Camry—and seizure of cocaine and a firearm in the cabin of the vehicle— was lawful.

**C.    The Officers Had Probable Cause to Seize What Appeared to be Cocaine in Plain View in Defendant's Camry.**

The Fourth Amendment to the Constitution provides for "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  The Supreme Court has defined a search as either an invasion of an "actual

- 15 -

(subjective) expectation of privacy" which "society is prepared to recognize as 'reasonable,' " *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan J., concurring), or a "physical intrusion of a constitutionally protected area," in an attempt to attain information, *Florida v. Jardines*, 569 U.S. 1, 5 (2013) (internal quotation marks and citation omitted); *see United States v. Jones*, 565 U.S. 400, 408 n.5 (2012). Additionally, "[a] 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Karo*, 468 U.S. 705, 712 (1984) (internal citations omitted).

The Fourth Amendment generally requires that all searches be supported by a warrant based upon probable cause. *Katz*, 389 U.S. at 357. However, "[b]ecause the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). Indeed, over time the Supreme Court has carved out "a few specifically established and well-delineated exceptions" to the warrant requirement. *Katz*, 389 U.S. at 357. One exception to the warrant requirement, the seizure of evidence in "plain view," is pertinent here.

The Supreme Court first articulated the "plain view" doctrine in *Coolidge v. New Hampshire*, explaining that an officer who "inadvertently comes across an incriminating object," with a "legitimate reason for being present unconnected with a search directed against the accused," may seize the evidence without a warrant. 403 U.S. 443, 466 (1971). The Court later articulated in *Horton v. California*, 496 U.S. 128, 136-37 (1990), that the plain view doctrine applies when: "(1) the seizing officer [is] lawfully present at the place from which he can plainly view the evidence; (2) the officer has a lawful right of access to the object itself; and (3) it is immediately apparent that the item seized is incriminating on its face." *United States v. Williams*, 41 F.3d 192, 196 (4th Cir. 1994). The incriminating nature of an item is "immediately apparent"

if an officer has "'*probable cause to associate the property with criminal activity.*'" *Texas v. Brown*, 460 U.S. 730, 741–42 (1983) (quoting *Payton v. New York*, 445 U.S. 573, 587 (1980)).

Courts have frequently applied the "plain view" doctrine to evidence inside of an automobile. *See Brown*, 460 U.S. at 737 (upholding seizure of a party balloon containing heroin that officer observed in driver's hand, where officer also saw plastic vials, white powder, and an open bag of party balloons in the vehicle); *United States v. Hall*, 397 F. App'x 860, 862 (4th Cir. 2010) (unpublished) (holding officer conducted a valid plain view seizure of marijuana visible on the vehicle's floor board and further noting "[w]ith respect to the firearm, which was under a seat, and arguably not in plain view, the discovery of the marijuana in plain view gave police probable cause to conduct the search of the vehicle that ultimately led to the firearm's discovery"); *United States v. Chulengarian*, 538 F.2d 553, 554 (4th Cir. 1976) (officer looked through open car door and seized open brown bag containing what appeared to be marijuana, along with marijuana cigarette, and smoking pipe).

Officer Bianchi testified that upon looking into Defendant's car with his flashlight he saw a bag in the center console of the Camry which contained a white powder. Officer Bianchi's bodycam footage corroborates this testimony.  Given his experience and training, Officer Bianchi credibly testified that he believed this substance was cocaine.  Further, Officer Bianchi testified that upon searching Defendant's abandoned Camry, Officer Bianchi found said bag in the same position it was when he initially observed it. Officer Bianchi testified that upon being field tested, the white substance in the bag tested positive for cocaine.

The Court finds that the Officers' seizure of the plastic bag inside the Toyota was valid under the "plain view" doctrine because each of the *Horton* prerequisites are satisfied. Officer Bianchi was in a lawful position to view the bag in the Toyota's center console while standing

next to and looking into Defendant's passenger window with a flashlight. The Officers also had lawful access to the bag through the open front driver's side door after Defendant abandoned his vehicle. *See United States v. Cuningham*, 546 Fed. App'x 203, 207-08 (4th Cir. 2013) (defendant fled from police on foot, leaving his truck at a gas station with the driver's side door open, and officers returned to the truck and seized a firearm in plain view on the seat).

The Court further finds that the incriminating nature of the bag was immediately apparent, because there was probable cause to believe it contained illegal narcotics. The Supreme Court has adopted a "totality-of-the-circumstances" approach for probable cause determinations. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Under this test, the question before the issuing magistrate is "whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* at 243, n. 13. It is "not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). Rather, the Supreme Court has reiterated that the probable cause standard is a "practical, nontechnical conception." *Gates*, 462 U.S. at 231. It "is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232.

Here, the totality of the circumstances would give a reasonable officer probable cause to believe the bag contained narcotics. From his experience and training, Officer Bianchi identified the substance in the bag in the center console as cocaine. When Officer Frederick asked the Defendant to exit the Camry, the Defendant fled, eventually wrecking his car and abandoning it— all bolstering the inference that the bag in the center console contained contraband. Further, by

the time the Officers retrieved the bag of cocaine from the open Camry, Officer Frederick had smelt marijuana emanating from the car and various officers had smelt marijuana emanating from the black garbage bag which had originally been observed on the ground of the front seat of the car. *See United States v. Wells*, 98 F.3d 808, 810 (4th Cir. 1996) (rejecting defendant's argument that the incriminating character of the item must be readily apparent to the individual agent who actually seizes it and holding that in determining whether the incriminating character of the seized item is "readily apparent," it is sufficient if "the agents collectively ha[ve] probable cause to believe the [item] was evidence of a crime at the time of the seizure." ). Based on the totality of facts and circumstances, an objectively reasonable officer could conclude that the plastic bag containing white powder inside the vehicle was evidence of criminal activity. Accordingly, the Officers lawfully seized the cocaine found in Defendant's Camry.

**D.      When Defendant Abandoned His Camry After Fleeing the Officers, He Forfeited Any Privacy Interest in the Car or its Contents.**

As the Court noted *supra*, the Officers did not "seize" Defendant under the Fourth Amendment when they approached him in his Camry. Regardless, when Defendant fled and abandoned his totaled car, Defendant forfeited any future challenge to the Officers' subsequent search of the vehicle.

The Fourth Amendment protects property for which an individual maintains a "subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States,* 533 U.S. 27, 33, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001). A person who voluntarily abandons his property "loses any reasonable expectation of privacy in the property and is consequently precluded from seeking to suppress evidence seized from the property." *United States v. Leshuk,* 65 F.3d 1105, 1111 (4th Cir.1995). In determining whether property has been abandoned, a court must consider

- 19 -

"'not whether all formal property rights have been relinquished, but whether the complaining party retains a reasonable expectation of privacy in the [property] alleged to be abandoned.'" *United States v. Stevenson,* 396 F.3d 538, 546 (4th Cir.2005) (quoting *United States v. Haynie,* 637 F.2d 227, 237 (4th Cir.1980)) (alteration in original).

Upon being asked to step out of the car, Defendant threw his Camry into reverse, drove forward into another parked car, and then sped away from the Officers. When the Officers located Defendant's Camry, live testimony and bodycam footage confirmed it was disabled and that the driver's door was open. Defendant was nowhere to be found. The Officers credibly testified, and Defendant did not attempt to dispute, that no one came forward to claim the vehicle that evening. The Court therefore finds that Defendant abandoned his vehicle after fleeing from the Officers. *See United v. Kirlew*, 291 Fed. App'x 536, 538-39 (4th Cir. 2008) (unpublished) ("[T]he fact that [Defendant] vacated his car in an effort to evade capture by the police does not make his abandonment of the vehicle involuntary.") (citing *United States v. Flynn,* 309 F.3d 736, 738 (10th Cir. 2002)). Accordingly, upon voluntarily abandoning his Camry with its driver's door open in the middle of the thoroughfare connecting two parking lots at the complex, Defendant forfeited any reasonable expectation of privacy in the car and its contents. *United States v. Hopkins*, 568 Fed. App'x 214, 215-16 (4th Cir. 2014) (unpublished) (finding defendant abandoned vehicle and lacked standing to challenge subsequent search where defendant fled police, fled wrecked car on foot, and left the key in the ignition with the doors open); *Kirlew*, 291 Fed. App'x at 538-39 (holding that the defendant abandoned the car he was driving, thus relinquishing any reasonable expectation of privacy to the contents of the car, when he jumped out of the still-moving car and fled on foot during a high speed chase with police); *see also, e.g.*, *United States v. Basinski,* 226 F.3d 829, 837 (7th Cir.2000) (noting abandonment may be found where a fleeing defendant

"relinquishes an object to make his flight easier"); *United States v. Knaub*, No. 95-30153, 1996 WL 146690, at *1 (9th Cir. April 1, 1996) (defendant lacked standing to challenge search of glove compartment because he fled vehicle leaving motor running and doors open); *United States v. Libbett*, No. 05-CR-6069L, 2006 WL 2620049, at *10 (W.D.N.Y. Sept. 13, 2006) (defendant abandoned car, and thus abandoned any reasonable expectation of privacy he may have had in the car, when he fled on foot leaving driver's door wide open and engine running).

In sum, for the reasons above, Defendant forfeited any reasonable of expectation of privacy in the Camry when he abandoned it and has no standing to challenge the Officers' subsequent search of the Camry or seizure of its contents.

**E.      The Officers Would Have Inevitably Discovered the Cocaine and Firearm in the Camry.**

Under the "inevitable discovery" doctrine, first articulated by the Supreme Court in *Nix v. Williams*, 467 U.S. 431, 444 (1984), improperly seized evidence may nevertheless be admitted "*[i]f* the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *See, e.g.*, *United States v. Bullette*, 854 F.3d 261, 266–67 (4th Cir. 2017). "Lawful means" include an inevitable search falling within an exception to the warrant requirement, such as an inventory search, that would have inevitably uncovered the evidence in question. *See Bullette*, 854 F.3d at 265; *United States v. Allen*, 159 F.3d 832, 841 (4th Cir. 1998). Whether law enforcement would have inevitably discovered the evidence by lawful means is a question of fact. *Allen*, 159 at 838-39; *see also Murray v. United States*, 487 U.S. 533, 543-44, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988).

An inventory search of an automobile is lawful (1) where the circumstances reasonably justified seizure or impoundment, and (2) law enforcement conducts the inventory search

according to routine and standard procedures designed to secure the vehicle or its contents. *See Colorado v. Bertine*, 479 U.S. 367, 371-76, 107 S. Ct. 738, 93 L. Ed. 2d 739 (1987); *United States v. Brown*, 787 F.2d 929, 931-32 & n.3 (4th Cir. 1986). Impoundment constitutes a reasonable course of action when the owner of a vehicle abandons it, or law enforcement cannot identify the owner. *South Dakota v. Opperman*, 428 U.S. 364, 375, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 (1976); *Brown*, 787 F.2d at 932-33. This remains true even if law enforcement has alternatives to impounding the vehicle. *See Brown*, 787 F.2d at 932-33.

At the suppression hearing, Officer Bruce credibly testified that Defendant's disabled, abandoned Camry was found in the thoroughfare between two parking lots. As noted above, bodycam footage confirms this. Officer Bruce testified that the police would not have left the Camry where it was. Instead, Officer Bruce testified that the officers would have performed an inventory search of the car and then towed the vehicle. Officer Bruce testified that inventory searches are done to secure valuables that might be present within an abandoned vehicle. Officer Bruce testified that if an officer were to find drugs in the cup holder of a car while conducting an inventory search, that would transform the search into a probable cause search. Officer Bianchi testified in substantially the same manner. Further, as noted above, Officer Bruce credibly testified that while searching the abandoned Camry, he saw a loose panel on the right driver's side of the center console behind which he found a firearm. Officer Bruce testified that loose panels are indicative that an individual is using the space behind the panel to hide contraband.

At the suppression hearing, Defendant introduced into evidence the City of Charleston Police Department Field Guide. Section 41 states that "[a]n inventory of a vehicle that is being towed does not require a search warrant. It is not a search for evidence, so pulling off door panels or removing air ducts is not permitted without probable cause."

The Court finds that the Officers would have inevitably discovered the cocaine and firearm in Defendant's Camry.  As noted above, the Court has already found Defendant abandoned the Camry after fleeing the Officers. The Court further finds Officer Bruce's testimony that the Officers would not have left a disabled, abandoned vehicle blocking the thoroughfare between two parking lots at the complex logical and credible. Further, as already noted, the cocaine in the center cupholder was plainly visible through the vehicle's windows.  If the Officers had conducted an inventory search of the Camry before towing it, the Officers would have undisputedly discovered the cocaine. Once the cocaine would have been found, the search would have transformed into a probable cause search permitting the Officers to remove the loose panel in the center console, revealing the gun.  Defendant's briefing presents no rational argument to the contrary.

IV.    **Conclusion**

For the foregoing reasons, Defendant's motion to suppress (Dkt. No. 65) is **DENIED.**

**AND IT IS SO ORDERED.**


/s Richard Mark Gergel
Richard Mark Gergel
United States District Judge

November 10, 2021
Charleston, South Carolina

- 23 -